### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JESUS DANIEL SERRATO AGUERO, )<br>)<br>Defendant. ) | Case No. CR-25-75-PRW |

### **ORDER**

Before the Court is Defendant's Motion to Suppress Evidence (Dkt. 33) and the United States's Response (Dkt. 37). The Court heard evidence and arguments on the matter at a hearing on July 1, 2025. For the reasons that follow, the Motion (Dkt. 33) is **DENIED** in part and **GRANTED** in part.

*Background*

Sometime prior to 8:50pm on February 16, 2025, the Drug Enforcement Administration became aware that a pickup truck in New Mexico may have a substantial amount of illegal narcotics hidden inside its tires for transport to the east. The DEA placed a GPS tracking device on the truck and tracked its movements to the east on Interstate 40 as it was being towed on a trailer behind a pickup truck driven by the Defendant, Jesus Serrato Aguero. The DEA notified the Oklahoma Highway Patrol and requested that it attempt to make a traffic stop on the vehicle. OHP Trooper Joa'n Alvarez positioned his patrol car on Interstate 40, just east of where the speed limit reduced from 75 mph to 70 mph, and waited for Aguero to pass by in the eastbound lanes, in the hopes of catching him

1

in a traffic violation. An OHP canine unit was nearby, ready to arrive on scene to conduct an open air sniff of the truck if a stop was made. When Aguero passed by, Trooper Alvarez testified that his stationary radar clocked Aguero at 75 mph, five miles per hour over the speed limit. Trooper Alvarez thus initiated a traffic stop on the vehicle at approximately 8:50pm.

After Aguero stopped, Trooper Alvarez approached the vehicle and asked for Aguero's driver's license and informed Aguero that he had been stopped for "nothing major" and that he would only receive a warning and soon be on his way. Trooper Alvarez invited Aguero to join him in the front passenger seat of the OHP unit while Trooper Alvarez wrote Aguero the warning, and Aguero did so after a quick pat down by Trooper Alvarez to ensure Aguero did not have a weapon.

In the OHP unit, Trooper Alvarez engaged Aguero in conversation while running his license and registration and writing the warning. Aguero was uncuffed throughout the entire conversation. Trooper Alvarez asked Aguero about his travel plans, and Aguero said he was transporting the towed truck, which belonged to his cousin in Tulsa, back to his cousin after the truck's transmission broke down in New Mexico. Aguero explained that his cousin's wife had driven from Tulsa to New Mexico to retrieve Aguero's cousin, while leaving the broken-down truck in New Mexico to be retrieved later.

Ninety seconds after Aguero entered the OHP unit, OHP Trooper Jake Sawatzky arrived with the drug dog, and Trooper Alvarez asked Trooper Sawatzky to perform a free air sniff with his canine around the exterior of the vehicles. The canine alerted on both the truck Aguero was driving and on the towed truck. Trooper Sawatzky informed Aguero that

2

the vehicles would be searched because of the alert. Aguero had been conversing with Trooper Alvarez in English up to this point, but when informed of the canine alert, he told the troopers his "English [was] not good." Seven minutes after Aguero was initially pulled over, he was placed in the back of the OHP unit so that the vehicles could be searched.

While searching the vehicles, OHP Troopers noticed that several lug nuts were missing from the towed truck's tires while other lugs showed wear marks suggesting that the tires had been removed and replaced multiple times. The troopers suspected the tires contained contraband. After entirely deflating the passenger rear tire, OHP troopers observed that it still appeared to be inflated, compounding their suspicions that something had been stored in the tire. OHP troopers then transported Aguero and the vehicles to OHP headquarters in Clinton, Oklahoma, so that the truck could be more thoroughly searched. There they found 40 kilograms of methamphetamine stored in metal boxes welded to the rims of the towed truck's tires. Aguero was then Mirandized and arrested.

On March 4, 2025, Serrato Aguero was charged by Indictment with one count of possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Dkt.16). On June 6, 2025, Serrato Aguero filed this Motion (Dkt. 33), challenging the legality of his traffic stop and the subsequent warrantless search and asks the Court to suppress all evidence derived from the search. He further asserts that any statements he made to law enforcement prior to being Mirandized were made in response to a custodial interrogation and should be suppressed.

*Legal Standard*

The Fourth Amendment protects against unreasonable searches and seizures.[1] A traffic stop is a Fourth Amendment-protected seizure and thus must meet the Amendment's reasonableness requirement, meaning the stop must be "justified at its inception and the officer's actions must be 'reasonably related in scope' to the 'mission of the stop.'"[2] An officer's observation of a traffic violation justifies a reasonable seizure under the Fourth Amendment.[3] To determine the reasonableness of an officer's actions during the stop, the Court "consider[s] whether the officer[] diligently pursued the mission of the stop."[4]

Further, the Fourth Amendment's warrant requirement is subject to an exception for a warrantless search of an automobile when officers have "'probable cause to believe a car contains contraband [to] search the car without first obtaining a search warrant.'"[5]

Finally, the Fifth Amendment protects against compelled self-incrimination.[6] In order to use statements at trial gleaned from a defendant during custodial interrogation, the defendant must be adequately informed of certain rights.[7] The Miranda requirement is triggered when a suspect is both "'in custody'" and when he is subjected to

---

[1] *Elkins v. United States*, 364 U.S. 206, 222 (1960).

[2] *United States v. Cortez,* 965 F.3d 827, 833 (10th Cir. 2020) (citations omitted).

[3] *United States v. Botero-Ospina,* 71 F.3d 783, 787 (10th Cir. 1995).

[4] *United States v. Mayville,* 955 F.3d 825, 831 (10th Cir. 2020) (citation omitted).

[5] *United States v. Chavez,* 534 F.3d 1338, 1345 (10th Cir. 2008) (citations omitted).

[6] *Miranda v. Arizona,* 384 U.S. 436, 439 (1966).

[7] *Id.* at 444.

"'interrogation.'"[8] First, a defendant is considered to be "in custody" when a reasonable person in the defendant's position would "consider [his] freedom of movement to be restricted to a degree consistent with formal arrest[.]"[9] This is a fact-specific test that considers the totality of the circumstances by examining whether the atmosphere of the questioning was "police-dominated," whether the suspect was informed he was free not to answer questions, and "whether the nature and length of the officers' questioning was accusatory or coercive."[10] Second, questioning is considered "interrogation" when it includes "'any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"[11]

## Analysis

I. *Aguero's initial detention for a traffic violation did not violate the Fourth Amendment.*

Serrato Aguero first argues that his traffic stop was unlawful at its inception because the alleged speeding violation—which he claims did not occur—was a mere pretext for a narcotics trafficking investigation. The government responds that Trooper Alvarez's subjective motives for stopping Aguero do not invalidate the reasonableness of the stop because it was based on an observed traffic violation.

---

[8] *United States v. Jones,* 523 F.3d 1235, 1239 (10th Cir. 2008) (citation omitted).
[9] *United States v. Revels,* 510 F.3d 1269, 1270 (10th Cir. 2007).
[10] *Id.* at 1275 (citation omitted).
[11] *United States v. Perdue,* 8 F.3d 1455, 1464 (10th Cir. 1993) (citation omitted).

The Court finds that Aguero's traffic stop was not unreasonable at its inception because Trooper Alvarez pulled Aguero over after observing him driving over the speed limit. The Tenth Circuit has held that it is "irrelevant that [an] officer may have had other subjective motives for stopping [a] vehicle."[12] Even if Trooper Alvarez lay in wait for Aguero for reasons other than speeding, because Aguero was observed speeding, the stop was valid.

The dispute here centers on the sufficiency of the government's evidence of the speeding violation. At the suppression hearing, Trooper Alvarez provided sworn testimony that his radar indicated that Aguero was driving 75 mph in a 70 mph zone. But here's the twist: at the hearing, Aguero introduced data from the GPS device the Government had placed on the towed truck.[13] The dataset is timestamped in 21-second increments and notes a speed recorded for each increment, which neither party disputes. Aguero places great weight on this GPS data, arguing that it definitively establishes that he was not speeding at any point in the more than three-minute period prior to his traffic stop.[14]

There are a lot of problems with that assertion. First, Aguero provided no witness to explain the GPS dataset. That matters for a number of reasons. For starters, the time stamps in the dataset are not in Central Standard Time (CST). Aguero's counsel proffered that the dataset is in Coordinated Universal Time (UTC) and must be converted to CST. That conversion *seems* to work and aligns the dataset with the CST times at which the

---

[12] *Botero-Ospina* 71 F.3d at 787.

[13] Excerpts from GPS Tracking Data (Dkt. 50, Ex 1).

[14] *Id.* at 4.

traffic stop occurred. Next, Aguero provided no evidence as to what the "speed" column in the dataset actually shows. The Court has no evidence of the accuracy of the GPS device's speed measurement, nor of what the indicated speed at a particular time actually means. Aguero's counsel argued that the indicated speed is the actual speed Aguero was travelling at the indicated point in time, but offered no evidence to confirm as much. The problem with this is that on its face the GPS dataset—due to its every 21-second location update—seems likely to be providing the vehicle's *average* speed over the prior 21-second interval. Most GPS device, after all, generally calculate speed by measuring the distance an object has travelled in a particular time interval and then calculating the speed the object would have averaged over that time interval to cover that distance. All of this, of course, is speculative, but that underscores the problem: the Court simply was not provided evidence that it could use to determine what exactly this GPS data tells it.

      This matters because the question is how much weight to assign this GPS evidence. More specifically: whether this evidence has sufficient weight to undermine Trooper Alvarez's unequivocal sworn testimony that he observed a radar indicated speed of 75mph. The Tenth Circuit has held that even an officer's visual estimation of a driver's speed can provide the necessary probable cause to justify a stop for speeding,[15] and here we have more than a visual estimation. We have a radar indicated speed. The Court is confronted with a definitive sworn statement by an experienced OHP Trooper of Aguero's radar-indicated speed prior to the stop, and a staccato of GPS timestamps indicating that in the

---

[15] *United States v. Ludwig,* 641 F.3d 1243, 1247 (10th Cir. 2011) (citations omitted).

12 minutes prior to the stop Aguero's speed ranged from 63 mph to 82 mph, with as much as 9 mph variations in his speed from one 21-second update to the next. And in in the minute just before Aguero was pulled over, the GPS data indicates a jump in average speed from 65 mph to 70 mph in the span of 21 seconds,[16] which could be explained by an acceleration over the speed limit in that interval. And even if Aguero's counsel's assertion that the GPS indicated speed isn't an average speed for the prior interval but rather an exact speed at the indicated moment in time is correct, the dataset does not tell us the speed Aguero was traveling in the intervals between updates. And a speed of 75 mph is well within the range of speeds the truck could have accelerated to in those gaps. Accordingly, the Court finds that Aguero's GPS evidence does not undercut Trooper Alvarez's sworn testimony.

Further, the Court finds that Troopers Alvarez and Sawatzky's actions during the stop were reasonably related in scope to the stop's mission. Neither party disputes the timeline of events in their briefing, corroborated by the dash cam video. Only ninety seconds after Aguero entered the OHP unit did Sawatzky arrive on the scene and begin the free air sniff. Only two and a half minutes elapsed between the time Aguero entered the OHP unit and when the canine unit alerted to drugs. Trooper Alvarez provided sworn testimony that he was still diligently completing his tasks related to the traffic stop, including running Aguero's license and registration, by the time the canine unit alerted to the drugs and that sworn testimony is corroborated by the dashcam video. The Tenth

---

[16] Excerpts from GPS Tracking Data (Dkt. 50, Ex 1) at 4.

Circuit has held that a canine unit's alert to drugs that occurs in tandem with the "reasonably diligent pursuit of the stop's mission," as was the case here, allows for the lawful extension of the mission to search the vehicle.[17]

II.   *The warrantless search of Aguero's vehicles did not violate the Fourth Amendment.*

Serrato Aguero's argument as to the illegality of the search rests on it being warrantless. The government responds that the positive alert to drugs by the canine unit provided the requisite probable cause to search the vehicles without a warrant under the automobile exception to the Fourth Amendment's warrant requirement.

The Court finds that the warrantless search of the vehicles was lawful. This search is the prototypical example that fits squarely within well-established caselaw allowing law enforcement to search a stopped automobile without a warrant when they have probable cause to believe it contains contraband.[18] And as previously stated, a positive alert by a certified drug dog will supply law enforcement with the requisite probable cause to trigger the automobile exception,[19] and Aguero has not challenged the canine unit's alert.

III.   *Trooper Alvarez's conversation with Aguero did not violate the Fifth Amendment.*

Both parties agree that Aguero was legally under arrest once he was placed in the back of the OHP unit following the alert by the canine unit. The Government has stipulated that it will not attempt to introduce any statements made after that point.

---

[17] *Mayville* 955 F.3d at 833.

[18] *United States v. Oliver,* 363 F.3d 1061, 1068 (10th Cir. 2004) (citations omitted).

[19] *Ludwig* 641 F.3d at 1250–51 (citation omitted).

Aguero first argues that Trooper Alvarez's questions as to where Aguero's cousin in Tulsa lives and why his cousin did not fly back to Oklahoma City when the truck broke down went further than the law allows because they were asked to elicit incriminating responses. The Government counters this argument by asserting that the portion of the stop that occurred in the front seat of Trooper Alvarez's OHP unit was no more than a *Terry* stop and the questions were the type that have long been deemed permissible in this context.

The Court holds that Aguero's initial conversation in the front seat of Trooper Alvarez's OHP unit rises to the level of a *Terry* stop, but no further. The Tenth Circuit has held that "*Terry* stops must be limited in scope to the justification of the stop."[20] Further, officers are permitted during the course of a *Terry* stop to ask questions "in order to dispel or confirm their suspicions," as well as to take some steps to ensure their own safety.[21]

Trooper Alvarez's questions as to where Aguero's cousin lives in Tulsa and Aguero's lack of knowledge as to the truck-owner's location fit into the rubric of questions that the Tenth Circuit has held are permissible routine travel questions.[22] These questions can help provide context as to why the traffic infraction occurred and whether there is a risk of more dangerous traffic activity if, for example, the driver has been on the road for an extended amount of time without sleep.[23] Further, the Tenth Circuit has held that conversation between officers and the public during stops need not be rigidly germane to

---

[20] *Perdue* 8 F.3d at 1462 (citation omitted).

[21] *Id.*

[22] *Cortez* at 965 F.3d at 839 (citations omitted).

[23] *Id.*

the stop. Rather, officers are permitted to ask questions that are "'negligibly burdensome'" to ensure officer safety by "ask[ing] innocuous background questions to assess driver stress, nervousness, and evasiveness to help gauge the degree of caution necessary in conducting a stop."[24] The Tenth Circuit has deemed questions such as where a stopped driver works, what a significant other does for work, and where the driver will stay after arriving at her destination the sort of negligibly burdensome questions that do not constitute interrogation.[25] Here, asking where Serrato Aguero is going in Tulsa and whose truck he is hauling fit neatly on the right side of the line of permissible questioning.

Serrato Aguero next contends that he was in custody at the time of his conversation with Trooper Alvarez in the front seat of the OHP unit. Aguero argues that he was not free to leave because Trooper Alvarez still possessed Serrato Aguero's license during their conversation. The government counters that the atmosphere of the situation did not amount to the sort of coercive situation associated with a formal arrest.

The Tenth Circuit has held that the benchmark for determining whether an individual is in custody is if a reasonable person in the suspect's same position would have understood the officer's actions to curtail "a suspect's freedom of action" to a "'degree associated with formal arrest.'"[26] Looking at the totality of the circumstances,[27] the Tenth

---

[24] *Cortez* at 965 F.3d at 839 (citation omitted).

[25] *Id.*

[26] *Perdue* 8 F.3d at 1463 (citations omitted).

[27] *Revels* 510 F.3d at 1275 (citation omitted)

Circuit only considers what a reasonable person would have understood the situation to be, regardless of the involved officer's subjective intentions.[28]

First, the Court must determine whether the environment was "police-dominated."[29] The Tenth Circuit has held that a non-exhaustive variety of conditions would create such an atmosphere:

> separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.[30]

While the conversation occurred in the front seat of the patrol car, throughout the entire encounter Trooper Alvarez was polite, his voice level, and he laughed often during the beginning of the stop. He did not brandish a weapon, his pat-down of Aguero was not extensive, and there were no other officers in the vehicle during the conversation.

Second, the Court considers "whether the nature and length of the officer['s] questioning was accusatory or coercive."[31] As previously discussed, the questions Trooper Alvarez asked related mainly to the vehicles and about standard travel plans. They were not "harassing or especially prolonged[,]" lasting only a few moments until Trooper Sawatzky returned to the vehicle.[32]

---

[28] *Revels* 510 F.3d at 1275 (citation omitted).

[29] *Revels* 510 F.3d at 1275 (citation omitted).

[30] *United States v. Griffin,* 7 F.3d 1512, 1519 (10th Cir. 1993) (citations omitted).

[31] *Revels* 510 F.3d at 1275 (citation omitted).

[32] *United States v. Rith,* 164 F.3d 1323, 1323 (10th Cir. 1999).

The third factor in the analysis asks whether the suspect was informed he was not required to answer the officer's questions.[33] Serrato Aguero was not.

The Court holds that Aguero was not in custody before his being placed in the backseat of the OHP unit. The failure of Trooper Alvarez to tell Aguero that he was not obligated to answer his questions is not enough to overcome the likelihood that a reasonable person would not have believed himself to be under arrest.

## *Conclusion*

For these reasons, the Court **GRANTS** the Motion to Suppress (Dkt. 33) as to all statements made by Aguero after he was placed in the back of the OHP unit. The Court **DENIES** the Motion to Suppress as to all statements made before Aguero was placed in the back of the OHP unit and as to all evidence collected.

**IT IS SO ORDERED** this 11th day of July 2025.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

---

[33] *Revels* 510 F.3d at 1275 (citation omitted).